## J. S. KIDDER & CO. v. PAGE & MARTIN, PRINCIPAL DEFENDANTS, AND HARRY DOWNING, TRUSTEE.*

A creditor, who claims a lien on two funds but abandons his claim on one of the funds with full knowledge that his debt cannot be satisfied out of the other without injury to another creditor who has a subsequent lien on that fund only, will not thereby forfeit his lien on the second fund unless his right to resort to the fund which he chose to abandon was clear and not seriously contested, and the remedies for applying that fund were reasonably prompt and efficient.

Mortgaged property was taken from the possession of the mortgagee by an officer who attached it on writs against the mortgagors. After this had been done another creditor summoned the mortgagee as trustee of the mortgagors. Subsequently the mortgagee commenced an action of trover against the attaching officer. During the pendency of the trover suit, which was defended by the attaching creditors, the mortgagee received from other sources various sums to be credited to the mortgagors. The trover suit was finally compromised; the mortgagee receiving about half the value of the mortgaged property which had been taken from him, and the balance being mainly applied in satisfying the judgments recovered against the mortgagors by the attaching creditors:

Held, in the trustee suit, that the trustee's relinquishment of the trover suit did not operate as a payment of the mortgage debt to the value of the goods; but that the trustee was entitled to set off against the funds in his hands the entire unpaid balance due on the mortgage.

The holder of a partnership contract of suretyship is just as much entitled to be paid out of the partnership property as any other creditor of the firm.

But the ratification by the firm of the unauthorized act of one partner in signing the firm name to a contract of suretyship is ineffectual as against existing partnership creditors, being in substance an adoption by the firm of the private debt of one partner.

FOREIGN ATTACHMENT. The trustee disclosed the following facts: April 11th, 1866, the trustee held four notes against the firm of Page & Martin, amounting without interest to $3,946.32; and on that day Page & Martin, who were retail grocers in Manchester, mortgaged their stock of goods to the trustee to secure these notes. At the same time Page & Martin executed a second mortgage to the trustee to secure a note for $2,000, dated August 28, 1862, signed by W. P. Downing and the firm name of " Page & Martin." The statements in the disclosure tended to show that the firm signature was in the handwriting of Martin, that it was signed on or about the date of the note, before the money was advanced, that the trustee was not present when the firm signature was affixed, and that he had no conversation with Page about it before April 11th, 1865. It appeared that W. P. Downing had the money advanced on this note, and that it was known to the trustee that Page & Martin, if liable at all, would only be liable as sureties.

*Opinion delivered December Term, 1868.

April 12th, 1865, the trustee took possession under his mortgages. April 19th, 1865, the mortgaged goods were taken from the trustee by I. W. Farmer, a deputy sheriff, who attached them on various writs against Page & Martin; and the goods were subsequently sold at auction by Farmer for about $4600. April 25th, 1865, the present writ was served on the trustee. Soon after the trustee brought an action of trover against Farmer for the conversion of the mortgaged property. This suit was defended by the attaching creditors.

At the September term, 1866, of the Supreme Court for Hillsborough county the trover suit was disposed of by the rendition of judgment by agreement for plaintiff for $2100; and the balance of the $4600 in the sheriff's hands was mainly applied in satisfying the judgments of the attaching creditors. The trustee said in his disclosure : " I suppose the parties understood when I took the judgment for the $2100 that I should have no further claim upon the goods."

The trustee admitted the receipt of upwards of nine hundred dollars from collections of debts due to Page & Martin and from the proceeds of mortgaged goods sold after the execution of the mortgages and before the attachment.

Plaintiffs claimed that the trustee should be charged for these receipts, and that under the circumstances, he could not be allowed to set off either the unpaid balance on the four notes secured by the first mortgage, or the unpaid balance on the note of August 28th, 1862.

The questions of law arising upon the trustee's disclosure were reserved.

*C. R. Morrison* for plaintiffs.

*Eastman & Cross* for trustee.

SMITH, J. Although a trustee may be chargeable for goods of the principal defendant which were taken from his hands by a wrong-doer after the service of the trustee process (*Despatch Line of Packets* v. *Bellamy Man. Co.*, 12 N. H. 205), it seems clear that he cannot be charged for goods which were so taken from him before such service and never afterwards came into his possession. In the latter case the trustee never was under any obligation to the trusteeing creditor to retain the possession of the property; and the service of the trustee process does not impose upon the trustee the duty of commencing, without indemnity, an action against the wrong-doer to recover damages which shall enure, not to his own benefit, but to that of the trusteeing creditor. As the institution of an action against the wrong-doer is optional with the trustee, equally so must be the discontinuance of such an action after institution. If we suppose a case where the trustee would be liable to an action of tort, or special assumpsit, by the principal defendant to recover damages for his negligence in suffering the property to be taken, or for his failure to commence and prosecute an action against the wrong-doer, yet the creditors of the principal defendant cannot recover these damages to their use by means of a trustee process, since a

trustee is not chargeable for a tort, nor where the claim against him is for unliquidated damages only. *McKean* v. *Turner*, 45 N. H. 203; *Paul* v. *Paul*, 10 N. H. 117; *Foster* v. *Dudley*, 30 N. H. 463; *Rand* v. *White Mountain Railroad*, 40 N. H. 79.

The trustee therefore is not chargeable directly for the goods taken from him before he was summoned as trustee, and we do not understand that there is any serious controversy on this point.

The plaintiffs, however, attempt to charge the trustee indirectly for a part of the same property, upon the ground that the trustee's abandonment of the suit against the sheriff upon receiving only a part of the value of the mortgaged property "must operate as a payment of the mortgage debt to the value of the goods." As between the mortgagors and the mortgagee this result would not follow. We need not inquire what the rule would be if the property taken by the wrong-doer from the mortgagee had not afterwards been applied for the benefit of the mortgagors; for in the present instance the mortgaged property was ultimately applied in satisfaction of judgments recovered against the mortgagors. In the eye of the law the application of these goods to pay the debts of the mortgagors enured to their benefit as much as if the goods had been returned to the mortgagors, and such application would operate to the same extent in mitigation of damages. As it is not proved that the sum realized at the sheriff's sale was not the fair value of the goods, the mortgagors would seem entitled to recover only for the taking and detention, and nothing more than nominal damages for the value of the goods; see *Pierce* v. *Benjamin*, 14 Pick. 356; *Kaley* v. *Shed*, 10 Metcalf 317; *Howard* v. *Cooper*, 45 N. H. 339, 343; *Blake* v. *Johnson*, 1 N. H. 91, p. 93; *Perkins* v. *Thompson*, 3 N. H. 144.

But the plaintiffs contend that the judgments against the mortgagors in favor of the attaching creditors, and the subsequent application of the property to satisfy those judgments, are not evidence as against these present plaintiffs that the debts for which judgment was rendered were due from the mortgagors, or that the application was properly made; and assuming that the property was wrongfully so applied, the plaintiffs rely on the equitable doctrine of marshalling assets; citing *Edgerton* v. *Martin*, 35 Vermont 116, p. 122, where that doctrine was applied in a case arising under the trustee process. Conceding, for the purposes of this case, that the judgments are not evidence against these plaintiffs (see, however, *Benson* v. *Ela*, 35 N. H. 402), and that the above doctrine is applicable in cases of foreign attachment, the question is whether that doctrine aids the plaintiffs under all the circumstances of the present case.

Where one creditor has a lien upon two funds, and another creditor has a lien upon one only of these funds subject to the lien of the former, a court of equity will often compel the former to exhaust the fund upon which he only has a lien, before allowing him to satisfy any part of his claim out of the other fund; and, as a deduction from this principle, it is held, "that when a creditor who has a right of recourse against two different funds, has acted in such a manner as to put one of

them beyond his own reach, with full knowledge that his debt cannot be satisfied out of the other fund without injury to the interests of third persons, he will be held to have forfeited his right to the second, by the abandonment of the first. This is so held as a general principle of equity, that he who has willfully occasioned a loss, ought to bear it, and not throw the consequences of his wrong upon the shoulders of others." 2 Leading Cases in Equity, 3d Am. Ed. 271. But these principles can apply only when the creditor's right to resort to both funds is clear, and not seriously disputed, and when the remedies available for reaching and applying the funds are reasonably prompt and efficient. Because a creditor chooses to relinquish a doubtful or contested claim on one fund, and rely upon another fund about his right to which there is less dispute, can he be said to have " willfully occasioned a loss " to another creditor who had a lien on the latter fund alone? Here there was a serious controversy as to the trustee's right to the mortgaged property. If the plaintiffs in this case had, before the compromise, brought a bill in equity praying that the trustee might be compelled to exhaust his remedies to recover the mortgaged property, or its value, before he should be permitted to apply the funds in his hands to the payment of his claim, we should hardly have granted the request, except on condition that the plaintiffs would indemnify the trustee against all loss which might be occasioned by an adverse result in his litigation with the attaching creditors. It would have been inequitable to compel the trustee, in order to gratify these plaintiffs, to persevere in litigation which might be protracted, and the result of which could not be certain; see *Brinkerhoff* v. *Marvin*, 5 Johns. Ch. 320, p. 328; *Woolcocks* v. *Hart*, 1 Paige Ch. 185.

The plaintiffs, not having offered to assist or indemnify the trustee in his suit to recover the value of the mortgaged goods, are in no position to complain of his compromise of that suit.

The objection to the trustee's setting off the balance which he claims on the first mortgage cannot prevail.

The remaining question relates to the right to set off the balance due on the note of August 28, 1862.

If there were no evidence of Page's assent to the act of Martin in signing the firm name to the W. P. Downing note, the note would not be a partnership debt; one partner having no implied power to bind his firm by a contract of suretyship. Such a contract is not ordinarily within the scope and purpose of a partnership, and the burden of proof is on the holder to show the assent of all the partners before the firm can be charged. *Foot* v. *Sabin*, 19 Johnson 154; *Bank of Rochester* v. *Bowen*, 7 Wend. 158; Parsons on Partnership, 216; 3 Kent's Com. 47. But in the present case the execution by both partners, on April 11th, 1865, of a personal mortgage of firm property to secure this note is evidence from which, in the absence of all contrary testimony, we are inclined to infer that Page assented to Martin's act at the time Martin signed the firm name. See *Corser* v. *Paul*, 41 N. H. 24; *Shaw C. J.* in *Thayer* v. *White*, 12 Met. 343, p. 346; *Weed* v. *Carpenter*, 10 Wend. 404; *Russell* v. *Convers*, 7 N. H. 343;

*Butler* v. *Stocking*, 8 New York (4 Selden) 408 ; *Elliott* v. *Dudley*, 19 Barb. 326. There is no evidence that the firm was insolvent when the W. P. Downing note was signed, or that these plaintiffs were then existing creditors, or that the contract of suretyship was entered into with the intention of defrauding future creditors. Under these circumstances we see no sufficient reason why the payee of the note, who parted with his money on the faith of the partnership contract of suretyship, is not entitled to all the rights of a partnership creditor just as much as those plaintiffs whose claim is presumed to be for goods sold and delivered to the firm. The fact that the subject-matter of a contract purporting to be made by a partnership is out of the ordinary business of the firm imposes upon the party seeking to enforce it as a firm obligation the burden of showing the assent of all the partners, but when that assent is shown the contract stands, as a general rule, on an equal footing with all other partnership contracts. The aggregation of individuals called a partnership may bind themselves in their associate capacity by a *bona fide* contract of suretyship for a stranger, just as effectually as either of them could bind himself by a similar contract entered into by him in his individual capacity.

If, however, upon a jury trial, it shall appear that Page never assented to the suretyship till April 11th, 1865, a very different question will be presented. In this view of the facts the contract of suretyship would, prior to April 11th, 1865, have been binding on Martin alone ; and the assumption or adoption of it by the firm on that day would have amounted practically to pledging the credit of the firm, on the eve of insolvency, to secure the private debt of an individual partner to the manifest prejudice of the existing partnership creditors who had a right to be paid out of the partnership property in preference to the creditors of an individual partner. "Any attempt by sale or otherwise to divert the partnership funds from the payment of the partnership debts to the discharge of an individual liability of one partner would seem to be a plain violation of this right ;" see *Ferson* v. *Monroe*, 21 N. H. ; *Tenney* v. *Johnson*, 43 N. H. 144 ; *French* v. *Lovejoy*, 12 N. H. 458 ; *Benson* v. *Ela*, 35 N. H. 402 ; and a sale or assignment of the partnership property made with such a purpose is void as against creditors of the firm ; *same authorities.* The guaranty by a firm of the private debt of one partner can stand on no better ground than an application of partnership property to pay such a debt. *Phillips* v. *Ames*, 5 Allen 183. If such a guaranty is allowed as a claim against the firm, it obviously tends to diminish the dividend receivable by partnership creditors ; and if the security of *bona fide* partnership creditors is impaired, it can make no difference in principle whether the result is accomplished by improperly diminishing the partnership funds, as in *Ferson* v. *Monroe*, or by improperly increasing the claims against those funds, as in *Phillips* v. *Ames.* An attempt to do either is invalid as against partnership creditors.

In *Phillips* v. *Ames*, it appeared that the holder of the notes knew that the firm was insolvent at the time the guaranty was given. But in the present case we regard the knowledge of the trustee or of the part-

ners respecting the firm's financial condition as immaterial. If the firm never entered into any contract of suretyship until April 11th, 1865, it follows that the trustee has parted with no value on the faith of the firm credit, for the money was advanced more than two years before. The giving of the second mortgage was, in external form, a ratification by the firm of the act of one partner in pledging the partnership credit; but, in effect, it was an adoption by the firm of the private debt of one partner. To allow the form of the liability to distinguish the case from the guaranty by the firm of a debt contracted by one partner in his own name would be to offer a premium to the unlimited pledge of the partnership credit.

If the partnership never assented to the contract of suretyship until April 11th, 1865, the trustee cannot, as against existing partnership creditors, set off the balance due on the note of August 28th, 1862.

*Case discharged.*